1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF ARKANSAS
2                 WESTERN DIVISION

3

    UNITED STATES OF AMERICA,
4
                        Plaintiff,
5
        v.                          No. 4:12CR00014-SWW-13
6
                                    March 15, 2018
7    TERRELL KEENER,                Little Rock, Arkansas
                                    10:08 a.m.
8                     Defendant.

9            **TRANSCRIPT OF REVOCATION HEARING**
        BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
10               UNITED STATES DISTRICT JUDGE

11

APPEARANCES
12

On Behalf of the Government:
13

        MS. ERIN SIOBHAN O'LEARY, by
14          United States Attorney's Office
            Eastern District of Arkansas
15          425 West Capitol Avenue, Suite 500
            Post Office Box 1229
16          Little Rock, Arkansas  72203-1229

17   On Behalf of the Defendant:

18       MS. KIMBERLY DRIGGERS, by
            Federal Public Defenders Office
19          1401 West Capitol Avenue
            Little Rock, Arkansas  72201
20

21   Defendant present.

22

23

24       Proceedings reported by machine stenography and displayed
    in realtime; transcript prepared utilizing computer-aided
25   transcription.

Margaret M. Kruse, RMR, CRR, CSR
United States Court Reporter

1                       I N D E X

2    WITNESS                                    EXAMINATION

3      DETECTIVE RUSS LITTLETON                        7
       Direct Examination By Ms. O'Leary              7
4      Examination By Ms. O'Leary                     7
       Cross-Examination By Ms. Driggers             18
5      Examination By Ms. Driggers                   18
       Redirect Examination By Ms. O'Leary           20
6
       BRANDON DAVIS                                 22
7      Direct Examination By Ms. O'Leary             22
       Examination By Ms. O'Leary                    22
8      Cross-Examination By Ms. Driggers             29
       Examination By Ms. Driggers                   29
9
       BOBBI JORDAN                                  32
10     Direct Examination By Ms. O'Leary             32
       Examination By Ms. O'Leary                    32
11     Cross-Examination By Ms. Driggers             39
       Examination By Ms. Driggers                   39
12     Redirect Examination By Ms. O'Leary           40

13     DETECTIVE RUSS LITTLETON                       42
       Further Redirect Examination By Ms. O'Leary    42
14     Further Recross-Examination By Ms. Driggers    44

15                     E X H I B I T S

16   NUMBER                                     MARKED FOR ID

17
     Government's Exhibit 1                           11
18   Government's Exhibit 2                           12
     Government's Exhibit 3                           14
19   Government's Exhibit 4                           15
     Government's Exhibit 5                           26
20

21

22

23

24

25

1                              P R O C E E D I N G S

2        (Proceedings commencing in open court at 10:08 a.m.)

3              THE COURT:  Good morning.

4              MS. O'LEARY:  Good morning, your Honor.

5              MS. DRIGGERS:  Good morning.

6              THE COURT:  This is a hearing in the United States

7 versus Terrell Keener.

8      Mr. Keener is here with his attorney, Ms. Kim Driggers.

9 And the United States is represented by Ms. Erin O'Leary.

10      And, Ms. O'Leary, introduce to the Court the gentleman at

11 your table, please.

12              MS. O'LEARY:  Yes, your Honor.  With me today is

13 Russ Littleton.  He's a detective with the Little Rock Police

14 Department.

15              THE COURT:  Good morning.

16              DETECTIVE LITTLETON:  Good morning.

17              THE COURT:  This is a revocation hearing that was

18 continued for 90 days, and now we have a new petition to revoke.

19 We have some new alleged violations.  So what I'm going to need

20 to do is swear Mr. Keener to make sure he's competent and then

21 ask about the violations.

22      Would you please come forward, Mr. Keener, with

23 Ms. Driggers.  The clerk will swear you.

24      (Defendant sworn.)

25              THE COURT:  Mr. Keener, are you under the influence of

1    any drugs or medicine or anything that could interfere with your

2    ability to understand this proceeding?

3              THE DEFENDANT:  No, ma'am.

4              THE COURT:  And, Ms. Driggers, do you believe that

5    he's competent to proceed?

6              MS. DRIGGERS:  Yes, your Honor.

7              THE COURT:  The Court finds that Mr. Keener is

8    competent to proceed, so we will proceed.

9         The Court had already found that Mr. Keener was in

10   violation of the conditions of his release.  And because some of

11   the violations were old and he seemed to be doing better, the

12   Court continued this for 90 days.  So he's already been found in

13   violation.

14        I want to ask really, Ms. Driggers, whether she and

15   Mr. Keener have any objections to the subsequent violations,

16   mostly for those that are alleged in 2018?

17             MS. DRIGGERS:  No, your Honor.  The allegations that

18   are fairly recent are technical in nature and he admits to

19   those.

20             THE COURT:  All right.  Then there is one other

21   violation involving an arrest and charges of possession of

22   illegal substances.  Do you have any objection to that

23   violation?

24             MS. DRIGGERS:  Yes, your Honor.  It's a little bit of

25   a tough spot for us here because those charges are pending.  We

1   had continued this, in part because we hoped that the case had
2   been resolved, but his retained counsel fell down with the flu
3   at the last second.  So they had to continue that until April.
4   But he does have retained counsel, and I don't want to interfere
5   with any of that representation.  So the U.S. Attorney and I
6   have spoken and I believe she's going to put on proof, but I
7   don't anticipate asking many questions because I don't want to
8   interfere with that representation.
9       So we will deny the allegation number one and hold the
10  Government to its burden of proof.
11          THE COURT:  All right.  Of course, the burden of proof
12  in this hearing is by a preponderance of evidence.  It's not
13  beyond a reasonable doubt.
14          MS. DRIGGERS:  Yes, your Honor.
15          THE COURT:  I assume, Mr. Keener, that you understand
16  that?
17          THE DEFENDANT:  Yes, ma'am.
18          THE COURT:  All right.  The two of you may return to
19  counsel table.
20      Now, it seems to me we're going to have evidence.  So I'll
21  ask if anyone wants to invoke the witness sequestration rule?
22          MS. DRIGGERS:  Yes, your Honor.
23          THE COURT:  All right.  The witness sequestration rule
24  requires witnesses or potential witnesses to be excluded from
25  the courtroom when the Court hears evidence so that the

1    witnesses' testimony, that is the excluded witnesses' testimony,

2    will not be influenced by the evidence that the Court is

3    hearing.  This means if you think you're a witness or you might

4    be a witness, you are to be excluded from the courtroom at this

5    time, except for the first witness to be called and also the

6    Government's representative.

7              MS. O'LEARY:  Yes, your Honor.  That would be our

8    chemist, Mr. Davis, and Ms. Jordan, who is a witness as well.

9              THE COURT:  Everybody except those two, please leave

10   the courtroom.  The Marshal will show you where you may sit.  Of

11   course, don't discuss with anyone what we're doing in here.

12             MS. O'LEARY:  Your Honor, for the Court's knowledge,

13   the other two that were sitting with the chemist, those are

14   employees with the State crime lab.  They're here to watch

15   today.

16             THE COURT:  All right.  So they're not witnesses?

17             MS. O'LEARY:  Correct, your Honor.

18             THE COURT:  Very well.

19             MS. O'LEARY:  Your Honor, at this time I'd like to

20   call Detective Littleton to the stand.

21             THE COURT:  All right.  And the witness stand is right

22   up here, Mr. Littleton.

23        (Witness sworn.)

24

25

```
 1        DETECTIVE RUSS LITTLETON, GOVERNMENT'S WITNESS, DULY SWORN
 2                          DIRECT EXAMINATION
 3   BY MS. O'LEARY:
 4   Q.    Good morning.
 5   A.    Good morning.
 6   Q.    Can you please introduce yourself to the Court.
 7   A.    My name is Russ Littleton.  I'm a detective for the Little
 8   Rock Police Department.
 9   Q.    Detective, how long have you been with the LRPD?
10   A.    21 years.
11   Q.    What's your current assignment?
12   A.    Narcotics interdiction.
13   Q.    In January of 2017, were you with the narcotics unit?
14   A.    Yes.  I was with street narcotics.
15   Q.    In the course of your employment, did you come to
16   investigate a Mr. Keener?
17   A.    I did.
18   Q.    Do you see him here today in the courtroom?
19   A.    Yes.  He's sitting there in the black sweatshirt.
20   Q.    Did you, in the course of your position with the narcotics
21   unit, end up securing a search warrant that resulted in the
22   arrest of Mr. Keener?
23   A.    Yes, I did.
24   Q.    Can you tell the Court about how this search warrant began?
25   A.    Yes.  We had information from CIs that Mr. Keener was
```

1    selling methamphetamine out of the residence at 8106 Louwanda

2    Drive.

3         Previous to getting the search warrant, we'd made a buy

4    from that house from Mr. Keener out of his bedroom.  Information

5    from the CI was that he retrieved the narcotics from his

6    nightstand, weighed it out and then they exchanged money for the

7    narcotics.

8    Q.   Are what type of narcotics did the CI purchase?

9    A.   Methamphetamine.

10   Q.   Did you take that suspected methamphetamine into your

11   custody that day?

12   A.   Yes, I did.

13   Q.   I think I skipped over this.

14        When did that controlled purchase take place?

15   A.   That's on the 18th of January.

16   Q.   So January 18th of 2017?

17   A.   Yes.

18   Q.   Did you do a field test on that substance?

19   A.   Yes.

20   Q.   Did it field test positive?

21   A.   Positive for methamphetamine.

22   Q.   After this controlled purchase, did you discuss with the CI

23   the location of Mr. Keener's bedroom within that residence?

24   A.   Yes, I did.

25   Q.   And did the -- did you, in the course of your

1    investigation, learn which bedroom was Mr. Keener's?

2    A.    Yes.

3    Q.    For the orientation-wise, which bedroom in the residence

4    was Mr. Keener's?

5    A.    It was the southeast bedroom.

6    Q.    All right.  After this controlled purchase, did you seek a

7    search warrant?

8    A.    I did.

9    Q.    Did you obtain a search warrant?

10   A.    Yes, I did.

11   Q.    Were you part of the execution of that search warrant at

12   8106 Louwanda Drive?

13   A.    I was.

14   Q.    What date was that search warrant executed?

15   A.    It was executed the next day, on the 19th.

16   Q.    So January 19th of 2017?

17   A.    Yes.

18   Q.    And on that day, was Mr. Keener present at this residence?

19   A.    Yes, he was.

20   Q.    Did you encounter him personally?

21   A.    I did after SWAT had secured everybody.

22   Q.    Tell us about that.

23         After SWAT secured the home, what did you do?

24   A.    I entered the residence and went straight to where I knew

25   where the CI had said that his bedroom was and he was in the

1  bedroom with SWAT.

2  Q.   Was this the southeast bedroom?

3  A.   Yes, it was.

4  Q.   And at that time, was Mr. Keener taken into custody?

5  A.   Yes, he was.

6  Q.   Did you search the bedroom that was the southeast bedroom?

7  A.   I did.

8  Q.   In the course of your search, did you encounter any

9  contraband?

10  A.   Yes, I did.

11  Q.   And that contraband that you encountered, did you take that

12  into custody and place it -- eventually, was it placed into

13  evidence?

14  A.   Yes.

15  Q.   I'm going to hand you what's been premarked as Government's

16  Exhibits 1, 2, 3, and 4.

17      Are these items that you brought today for the preparation

18  of court?

19  A.   Yes.

20  Q.   Let's start with the exhibit -- what's premarked as

21  Government's Exhibit 1.  Before you cut it open, let's talk

22  about that one.

23  A.   Okay.

24  Q.   Was this an item that was taken into custody in the

25  southeast bedroom that day when Mr. Keener was located in the

1    bedroom?

2    A.    Yes, it was.

3    Q.    Can you describe for the Court where you found this item?

4    A.    Yes.  It was in the southeast bedroom nightstand.

5    Q.    All right.  You can go ahead --

6             MS. O'LEARY:  Your Honor, I move to enter this into

7    evidence as Government's Exhibit 1.

8             THE COURT:  All right.  Any objection?

9             MS. DRIGGERS:  No, your Honor.  I was previously -- I

10   had been given the opportunity to observe that.  I have no

11   objection.

12            THE COURT:  All right.  It's received as Government's

13   Exhibit 1.

14       (Government's Exhibit 1 received).

15   BY MS. O'LEARY:

16   Q.    Detective, go ahead and open that up so we can confirm that

17   this is the substance that you located in that nightstand.

18   A.    (Witness complies.)

19   Q.    Is this the item that you found in the nightstand?

20   A.    Yes, it is.

21   Q.    At the time you located the substance, did you have a

22   suspicion this was a controlled substance?

23   A.    Yes.

24   Q.    What did you believe that substance to be?

25   A.    To be heroin.

1   Q.   What other contraband did you locate in the bedroom that

2   day?

3   A.   Methamphetamine, marijuana, and digital scales.

4   Q.   Okay.  And where were the scales located that you just

5   mentioned?

6   A.   They were on the floor between the bed and the wall.

7   Q.   On the floor between the bed and the wall.  Was other

8   contraband located?

9   A.   Yes.  There were digital scales.  There was a jar with

10  marijuana and meth in it, and then a baggie of marijuana.

11  Q.   I'd like to draw your attention to what's premarked as

12  Government's Exhibit 2.

13       Where was this item located that day that you searched the

14  bedroom?

15  A.   It was inside the jar.

16  Q.   All right.

17  A.   That was next to the bed and wall.

18            MS. O'LEARY:  I move to enter this as Government's

19  Exhibit 2.

20            MS. DRIGGERS:  No objection, your Honor.

21            THE COURT:  All right.  It's received.

22       (Government's Exhibit 2 received.)

23  BY THE WITNESS:

24  A.   Should I open it up?

25

1    BY MS. O'LEARY:

2    Q.    Yes, Detective.  Thank you.

3    A.    (Witness complies.)

4    Q.    Is this the substance that you located in that jar?

5    A.    Yes.

6    Q.    All right.  And at the time that you secured that

7    substance, in the course of your experience and training, did

8    you suspect it to be a controlled substance?

9    A.    I suspected it to be methamphetamine.

10   Q.    Methamphetamine.

11         And would that be -- is it chard-like or is it powder?

12   A.    No.  It's chard.

13   Q.    Does that have another term?

14   A.    It's ice.  They call it ice.

15   Q.    Ice.

16         And this type of ice, in your training and experience,

17   would this be an amount that would be what we term a user amount

18   or would it be considered an amount that would be intended to

19   distribute?

20   A.    Both the heroin and the methamphetamine would be

21   distributing amounts.

22   Q.    Detective, I'd like to draw your attention to what's been

23   premarked as Government's Exhibit 3.

24         Was this substance also located in the bedroom?

25   A.    Yes.

1  Q.   Where exactly was this substance located?

2  A.   This one was under the bed in the southeast bedroom.

3       MS. O'LEARY:  I'd like to enter this as Government's

4  Exhibit 3.

5       MS. DRIGGERS:  No objection, your Honor.

6       THE COURT:  All right.  It's received.

7       (Government's Exhibit 3 received).

8       (Witness opens package.)

9  BY MS. O'LEARY:

10 Q.   Is this that substance that you located underneath the bed?

11 A.   Underneath the bed, yes.

12 Q.   And you believe this to be a controlled substance.  What

13 did you believe this to be?

14 A.   Marijuana.

15 Q.   As far as this being a user amount or a distributable

16 amount, in your training and experience, did you make a

17 determination at that time as to what you believed this

18 marijuana was intended for?

19 A.   If it was by itself, it could be a user amount.  But with

20 the other drugs, it's distributable.

21 Q.   As far as the scales go, too, are the scales that you

22 located in the bedroom, would those be used to weigh out

23 marijuana?

24 A.   Yes.

25 Q.   As well as the heroin and methamphetamine?

1    A.    Yes.

2    Q.    And finally, Government's -- what's been remarked as

3    Government's Exhibit 4, where was this item located?

4    A.    This was in the southeast bedroom on the floor next to the

5    jar that had the methamphetamine and other small bags of

6    marijuana.

7              MS. O'LEARY:  I'd like to move to enter this as

8    Government's Exhibit 4.

9              MS. DRIGGERS:  No objection.

10             THE COURT:  All right.  It's received.

11       (Government's Exhibit 4 received).

12       (Witness opens package.)

13   BY MS. O'LEARY:

14   Q.    Is this that substance?

15   A.    Yes.

16   Q.    What did you believe this substance to be?

17   A.    Marijuana.

18   Q.    And, Detective, was this substance packaged differently

19   than Government's Exhibit 3?

20   A.    It was just in a smaller baggie.

21   Q.    A smaller baggie.

22         And was it alone or was it inside something?

23   A.    It was sitting next to the jar.

24   Q.    Sitting next to the jar?

25   A.    Yes.

1  Q.   You mentioned this jar, it also contained marijuana and

2  suspected methamphetamine; is that correct?

3  A.   Yes.

4  Q.   In the course of your training and experience, have you

5  encountered jars before?

6  A.   Yes.

7  Q.   What is the use of the jar?

8  A.   Just to store drugs in.  Most of it you see stored

9  marijuana.

10  Q.   So that's not an atypical storage technique?

11  A.   It's just a general storage technique.

12  Q.   So to recap, Detective, on the day you executed this search

13  warrant, in the bedroom that you believe to be Mr. Keener's, you

14  located Mr. Keener?

15  A.   Yes.

16  Q.   And you located what you believe to be heroin in the

17  nightstand?

18  A.   Yes.

19  Q.   You located digital scales?

20  A.   Yes.

21  Q.   In fact, was it one set or three sets?

22  A.   It was three sets.

23  Q.   Three sets of digital scales.

24      And then you located two -- in two different spots, what

25  you believe to be marijuana?

Littleton - Direct (By Ms. O'Leary)          17

1    A.    Yes.

2    Q.    And methamphetamine?

3    A.    Yes.

4    Q.    And we -- in your testimony here today, we covered four

5    different items which are three different controlled substances.

6    However, did you take into custody that day additional items

7    that were not tested by the lab?

8    A.    Yes.

9    Q.    All right.  Did you also take into custody what would end

10   up being four separate bags of what appeared to be marijuana in

11   addition to that that was tested?

12   A.    Yes.

13   Q.    And a small bag of what you suspected to be heroin?

14   A.    Yes.

15   Q.    And two small bags of what you believed to be

16   methamphetamine?

17   A.    Yes.

18   Q.    In addition to what was tested?

19   A.    In addition to what was tested, yes.

20   Q.    And so that day these items were secured and placed into

21   evidence.

22         Were they submitted to the Arkansas State Crime Lab for

23   analysis?

24   A.    Yes, they were.

25   Q.    Did you attempt to interview Mr. Keener?

1    A.    I did.

2    Q.    Did you Mirandize him?

3    A.    Yes, he was Mirandized.

4    Q.    Did he choose to give a statement to you?

5    A.    Let me check, but I don't believe he did.

6          No, he did not give a statement.

7    Q.    And, Detective, in the time that you searched

8    Mr. Keener's -- what you believed to be Mr. Keener's bedroom,

9    did you also encounter anyone that was in the house that day?

10   A.    There was, I believe, two younger females, another white

11   male, and then the lady that owns the house.

12   Q.    Would the lady that owns the house be Ms. Jordan?

13   A.    Yes.

14          MS. O'LEARY:  All right.  I'll pass the witness at

15   this time.

16          THE COURT:  Ms. Driggers.

17                    CROSS-EXAMINATION

18   BY MS. DRIGGERS:

19   Q.    Detective Littleton, maybe I misheard you, but did you say

20   there were CIs, plural, that initially started this

21   investigation?

22   A.    Just a CI.

23   Q.    Just one?

24   A.    I just use, in general, CI's.

25   Q.    And the day that you applied for the search warrant, was

1    that the same day that the informant had told you about their

2    observations?

3    A.    Yes.

4    Q.    And was that the same day that you had the controlled buy?

5    A.    That particular one, yes.

6    Q.    So was the CI already under an agreement then at that

7    point?

8    A.    Yes.

9    Q.    What was the compensation for that informant?

10   A.    I'd have to look.  I don't have that on my paperwork.

11   Q.    Well, was it money?

12   A.    Yes.

13   Q.    So the CI was paid like that day?

14   A.    Yes.

15   Q.    Was the informant under any -- facing any charges, criminal

16   charges at the time?

17   A.    Not that I remember, no.

18   Q.    What about drug testing?  Did you drug test the CI?

19   A.    No.

20   Q.    And this informant told you that the southeast bedroom was

21   Mr. Keener's, right?

22   A.    Yes.

23   Q.    What other information did you have that suggested that was

24   Mr. Keener's bedroom?

25   A.    Just from what they told me, what the CI told me.

1    Q.   But there were other people in the house, right?

2    A.   Yes.

3    Q.   And, in fact, there was somebody else in the bedroom that

4    day that the search warrant was executed, right?

5    A.   In his bedroom, yes.  There was a female next to the

6    closet.

7    Q.   And then two other females in the house, right?

8    A.   Yes.

9    Q.   And then one other white male?

10   A.   Yes.

11   Q.   And there was also drug paraphernalia found in another

12   bedroom; is that right?

13   A.   Yes, the white male's bedroom.

14            MS. DRIGGERS:  Thank you, your Honor.  I don't have

15   any more questions.

16            THE COURT:  All right.  Would you like to follow-up

17   with redirect?

18            MS. O'LEARY:  Yes, your Honor, just a couple

19   questions.  I always say one question and then it doesn't end up

20   being just one.  So I won't make a promise I can't keep.

21                       REDIRECT EXAMINATION

22   BY MS. O'LEARY:

23   Q.   Detective, the CI that Ms. Driggers just questioned you

24   about, had you had previous encounters with this CI prior to

25   January 18 of 2017?

1    A.    Yes.

2    Q.    In your work with the CI, did you find the CI to be

3    reliable?

4    A.    Yes.

5    Q.    Did you find the CI to be one that you could use in the

6    course of your investigations?

7    A.    Yes.

8              MS. O'LEARY:  No further questions.

9              THE COURT:  Re-cross?

10             MS. DRIGGERS:  No, your Honor.

11             THE COURT:  Thank you, Mr. Littleton.  You may stand

12   down.

13             THE WITNESS:  Thank you.  Would you like me to take

14   this with me?

15             THE COURT:  Are you going to need the evidence again?

16             MS. O'LEARY:  Actually, your Honor, I believe for the

17   chemist.

18             THE COURT:  All right.  Just leave the evidence there

19   on the witness stand and I'll let her decide.

20             MS. O'LEARY:  You know, we can put the chemist on now

21   so that by the time we have a final witness, we won't need the

22   items out.

23        So we can call Mr. Davis to the stand now.

24             THE COURT:  All right.  Mr. Davis.

25        (Mr. Davis enters the courtroom.)

1          THE COURT:  Mr. Davis, the witness stand is right up

2     here, and I'll swear you in.

3          (Witness sworn.)

4          BRANDON DAVIS, GOVERNMENT'S WITNESS, DULY SWORN

5                     DIRECT EXAMINATION

6     BY MS. O'LEARY:

7     Q.    Can you please introduce yourself to the Court.

8     A.    I'm Brandon Davis.

9     Q.    Where are you employed, Mr. Davis?

10    A.    The Arkansas State Crime Lab.

11    Q.    And how long have you been with the Arkansas State Crime

12    Lab?

13    A.    About three-and-a-half years.

14    Q.    What's your title?

15    A.    Forensic chemist.

16    Q.    Prior to joining the Arkansas State Crime Lab, did you have

17    previous experience with chemistry?

18    A.    Yes.  I went to school for chemistry, bachelor's degree in

19    chemistry.  And I taught high school chemistry as well.

20    Q.    How many years did you teach high school chemistry?

21    A.    I taught for four years, three of which I did chemistry.

22    Q.    Wonderful.

23          What does it mean to be a forensic chemist with the

24    Arkansas State Crime Lab?

25    A.    We test evidence provided by law enforcement and determine

1    the presence of controlled substances.

2    Q.   All right.  And do you go through any particular training

3    to become a forensic chemist with the Arkansas State Crime Lab?

4    A.   Yes.  There's an internal training that we complete with

5    written, oral, and practical examination.

6    Q.   And then once you -- is that like a pass/fail thing?

7    A.   Yes.

8    Q.   Once you pass, do you continue to have continuing training

9    throughout the year?

10   A.   Yes.  We do yearly training, at least.

11   Q.   And in the process of analyzing substances that come to

12   your lab, are those brought to you?  Do you go pick them up?

13   Are they held somewhere?

14   A.   They're held in either a secure storage area or another

15   secure storage area that's specific to forensic chemistry in our

16   section.

17   Q.   You have a bunch of packages in front of you.  These have

18   been opened.  I'd like to draw your attention to what's been

19   marked as Government's Exhibit 1.

20        Do you recognize this package?

21   A.   Yes.  I see my seal.

22   Q.   All right.  And when you first received this package, was

23   it closed?

24   A.   Yes.

25   Q.   Is that something that you would check before you would

1    analyze the substance?

2    A.    Yes.  We're required to receive evidence in a sealed state.

3    Q.    Okay.  And so once you confirm it's in a sealed state, how

4    do you test the substance that you have in your hand?

5    A.    This substance, after receiving it and describing the

6    packaging and describing the substance, I would take a

7    representative sample and perform testing on that representative

8    sample.

9    Q.    Okay.  And did you do that for what's been entered as

10   Government's Exhibit 1?

11   A.    Yes.

12   Q.    I'll come back to the lab results in a second.

13   A.    Okay.

14   Q.    Let's look at Government's Exhibit 2.  Same thing, do you

15   recognize this package?

16   A.    Yes.

17   Q.    Do you see your handwriting on it or something?

18   A.    Yes.

19   Q.    Did you do it to make sure you knew that you worked with

20   that item?

21   A.    Yes.

22   Q.    And Government's 2, was that sealed at the time that you

23   obtained it for testing?

24   A.    Yes.

25   Q.    All right.  And did you take a representative sample and

1    successfully test this substance?

2    A.    Yes.

3    Q.    And what about Government's Exhibit 3?  I think that will

4    be sitting in front of you.

5    A.    Okay.  Yes.

6    Q.    Was that sealed at the time you received it?

7    A.    Yes.

8    Q.    And did you test that substance?

9    A.    Yes.

10   Q.    And what about Government's 4?  Do you recognize this

11   substance?

12   A.    Yes.

13   Q.    So that was sealed at the time you obtained it?

14   A.    Yes.

15   Q.    Okay.  And I'm going to --

16              MS. O'LEARY:  May I approach, your Honor?

17              THE COURT:  You may.

18   BY MS. O'LEARY:

19   Q.    I'm going to hand you what's been premarked as Government's

20   Exhibit 5.

21         Do you recognize this document?

22   A.    Yes.

23   Q.    And what is this document?

24   A.    This is the -- my report that I made after completing my

25   analysis.

1    Q.    And after analyzing these four substances, which are

2    Government's Exhibits 1 through 4, you created this lab report

3    stating what your findings were?

4    A.    Yes.

5          MS. O'LEARY:  Your Honor, I'd like to enter this into

6    evidence as Government's Exhibit 5.

7          MS. DRIGGERS:  No objection.

8          THE COURT:  It's received.

9    (Government's Exhibit 5 received).

10   BY MS. O'LEARY:

11   Q.    Mr. Davis, as far as what has been -- I'm going to look at

12   the item number.

13         So item No. 549076, which is the first listed in your lab,

14   this correlates to, I believe, Government's Exhibit 1.  Can you

15   confirm that for me, please.

16   A.    Yes.

17   Q.    And what was your finding when you analyzed this substance?

18   A.    I identified heroin, quetiapine, dimethyl sulfone,

19   niacinamide, and inositol.

20   Q.    And how much heroin was inside of the substance?

21   A.    I did not do any quantitative analysis.

22   Q.    So this net weight, this reflects all four or five

23   substances found in the greater substance?

24   A.    It represents the entire form of the package.

25   Q.    Gotcha.

Davis - Direct (By Ms. O'Leary)                    27

1        And what was that net weight?

2   A.   1.9975 grams.

3   Q.   Mr. Davis, do you have experience with analyzing substances

4   that contain heroin?

5   A.   Yes.

6   Q.   How common is it for these four other substances listed

7   below here to be inside of something that also contains heroin?

8   A.   Generally, not all of those items -- substances come

9   combined with heroin.  So fairly irregular.

10  Q.   Do any of them normally come with heroin?

11  A.   I believe inositol does come with heroin commonly.

12  Q.   I'm just asking because I'm not sure.  Thank you.

13       So that covers Government's Exhibit 1.  Your finding was

14  that it contained heroin, okay.

15       Let's look next on the second line.  This item number is

16  549078A.  I believe that this is tagged with Government's

17  Exhibit 4.  Can you please look at Government's Exhibit 4 and

18  check that for me?

19  A.   Yes.  That's correct.

20  Q.   All right.  And what was your finding as to this substance?

21  A.   I found that it was marijuana.

22  Q.   And the net weight was 27.4 grams?

23  A.   That is correct.

24  Q.   And the next two lines, these would reflect that you

25  received substances, but you did not test them, correct?

1    A.    Yes.

2    Q.    And can you please state the lab policy that would cause

3    you to not test various items that are given to you in evidence?

4    A.    It's our policy to only test to the highest statutory

5    limits, based on -- in this case, state statutes.

6    Q.    State statutes, thank you.

7          Let's go to line No. 5.  It's item No. 549081A.  Can you

8    check?  I believe that would be what's been entered as

9    Government's Exhibit 2.  Can you check that the property tag

10   correlates?

11   A.    That's correct.

12   Q.    And what was your finding on this substance?

13   A.    That it was methamphetamine and dimethyl sulfone.

14   Q.    And what was the net weight?

15   A.    It's 28.2787 grams.

16   Q.    And then the next two lines, you did not test these items,

17   correct?

18   A.    That's correct.

19   Q.    Did you have a suspicion as to whether these items -- I

20   guess let me start over.

21         You didn't test them.  Can you state why?

22   A.    Regardless of what they were, they wouldn't have achieved a

23   higher statutory limit.

24   Q.    Okay.  And so the first you described as an off-white

25   crystalline substance, and the second is a tan powder?

1    A.    Yes.

2    Q.    All right.  Finally, on the last line which has a property

3    item tag number of 549083, I believe that's Government's

4    Exhibit 3.  Can you check that?

5    A.    Yes, that's correct.

6    Q.    And what was your finding as to this substance?

7    A.    That it was marijuana.  It was 109.6 grams.

8    Q.    Mr. Davis, heroin, marijuana, and methamphetamine, are

9    those all controlled substances?

10   A.    Yes.

11            MS. O'LEARY:  I'll pass the witness.

12            THE COURT:  Ms. Driggers.

13                      CROSS-EXAMINATION

14   BY MS. DRIGGERS:

15   Q.    Good morning, Mr. Davis.

16   A.    Good morning.

17   Q.    At the time that you tested the materials in this case, you

18   had been with the State Crime Lab for about three years; is that

19   right?

20   A.    About two-and-a-half years, I believe, at that point.

21   Q.    Two-and-a-half.

22         I'm looking at your CV here, and it looks like some of the

23   training you started in February of 2015; is that right?

24   A.    I started at the crime lab in November of 2014.

25   Q.    And then you started the training in February of 2015?

1    A.    No.   Those are additional training outside of the training

2    I received at the crime lab.

3    Q.    When did you start running tests on your own?

4    A.    March of 2015.

5    Q.    So by the time that you tested these substances, you had

6    been testing items on your own for about two years; is that

7    right?

8    A.    That's correct.

9    Q.    Okay.  And with respect to the lab report marked Exhibit 5,

10   the first entry, item No. 549076, that's the tan powder.  Did I

11   understand you right that you're not able to determine I guess

12   the -- you're not able to separate each of those substances; is

13   that right?  In other words, you can't tell us what the

14   percentage of heroin was from that sample and what the

15   percentage of dimethyl sulfone was, right?

16   A.    That's right.

17   Q.    And those four substances are not illegal, right?

18   A.    That's correct.

19   Q.    So we're not really sure what the concentration of heroin

20   was for that particular sample; is that right?

21   A.    That is right.

22   Q.    And do you keep reserves?  In other words, did you save

23   these -- a sample so that it can be tested later on?

24   A.    My representative samples were destroyed after the case is

25   completed.

1    Q.   Okay.

2         MS. DRIGGERS:  All right.  Thank you, your Honor.  No

3    more questions.

4         MS. O'LEARY:  No further questions, your Honor.

5         THE COURT:  All right.  Thank you, Mr. Davis you may

6    stand down.

7      (Witness excused.)

8         MS. O'LEARY:  Your Honor, at this moment, may we take

9    a moment to secure the controlled substances back in the bags,

10   and then I'll call Ms. Jordan to the stand.

11        THE COURT:  That would be fine.

12        MS. O'LEARY:  Thank you.

13     May Mr. Davis remain in the courtroom now that his

14   testimony's complete.

15        THE COURT:  Mr. Davis, you're excused.  You won't be

16   called again, so you may remain in the courtroom.  And you're

17   also free to go, as far as I'm concerned.

18     (Pause in proceedings.)

19        MS. O'LEARY:  Your Honor, I'll call Ms. Jordan to the

20   stand.

21        THE COURT:  All right.

22     (Witness sworn.)

23

24

25

1      BOBBI JORDAN, GOVERNMENT'S WITNESS, DULY SWORN

2                    DIRECT EXAMINATION

3   BY MS. O'LEARY:

4   Q.   Good morning.

5   A.   Good morning.

6   Q.   Can you please introduce yourself to the Court.

7   A.   I'm Bobbi Jordan.

8   Q.   And, Ms. Jordan, where do you live?

9   A.   8106 Louwanda Drive here in Little Rock.

10  Q.   Ms. Jordan, how long have you lived at the Louwanda Drive

11  address?

12  A.   Approximately 17-1/2 years.

13  Q.   So a long time.

14       So is it fair to say you were living there in January of

15  last year, so January 2017?

16  A.   Yes.

17  Q.   And at that time, in January of 2017, was Mr. Keener living

18  with you?

19  A.   Yes.

20  Q.   And do you see him here today?

21  A.   Pardon?

22  Q.   Do you see Mr. Keener here today in the courtroom?

23  A.   Yes.

24  Q.   Can you describe what he's wearing?

25  A.   A dark jacket with a hood, and I can't see his pants.

1    Q.    Okay.  That's sufficient.  Thank you, Ms. Jordan.

2          How did you know Mr. Keener?

3    A.    He was a friend of my son's.

4    Q.    What is your son's name?

5    A.    Robert Jordan.

6    Q.    Let's start with, do you recall when you first met

7    Mr. Keener?

8    A.    I can't tell you exactly how long it's been.  It's been at

9    least six years.

10   Q.    Okay.  And at some point in time, did he end up living in

11   your home?

12   A.    Yes.

13   Q.    Can you tell us how that started?

14   A.    Well, he came and said that he needed a place to stay.  His

15   mother had too many people at her house and could he stay in my

16   spare bedroom, and I said yes.

17   Q.    And do you recall around what time of year that was?

18   A.    It was either late October or early November.

19   Q.    And would this have been in 2016?

20   A.    Yes.

21   Q.    So late October of 2016, early November.

22         Was anyone else living with you in your home at the time

23   that Mr. Keener moved in?

24   A.    Well, my son was there part of the time, but not all of the

25   time.

1  Q.   And the spare bedroom, can you describe where that bedroom

2  was located in your home?

3  A.   I live in a tri-level house and the spare bedroom was

4  upstairs on the front of the house.  It would be the northeast

5  bedroom.

6  Q.   The northeast bedroom, okay.

7       Ms. Jordan, were you at home on January 19 of 2017?

8  A.   Yes.

9  Q.   Do you remember that day?

10 A.   (Nodding head.)

11 Q.   Can you explain for the Court what happened that day.

12 A.    I was sitting downstairs at my computer which is in the

13 lower level of the house and, all of a sudden, it sounded like a

14 bomb go off.  And I jumped up and started up the stairs, and I

15 saw a lot of smoke and embers and all.  So I stopped and was

16 turning to go back down the stairs when this man all dressed in

17 black with an assault rifle in his hand said, you know, "Stop.

18 Put your hands up."  So I did.

19       And he said, "Back down the stairs."  And I told him, you

20 know, that was going to be difficult because I had a very bad

21 knee.  Since then, I've had it replaced.  But he said, "Do it

22 anyway."  So I managed to get down the stairs and he sat me down

23 on my couch.

24       And, you know, then he warned me that they were going to

25 set off what he called a diversionary device in the backyard,

1    too, which being warned didn't really help much, but. . .

2        And he asked me if I was aware that I had a felon living in

3    my house.  And I said, well, I knew that he had done some things

4    and that -- but I -- he assured me that he was a changed person,

5    and I believed him wholeheartedly because he was very

6    convincing.

7        And I said, you know, "He doesn't do that anymore."  And

8    the guy said, "Well, no, ma'am.  We've had an undercover agent

9    buy drugs from him out of this house."

10   Q.   Did that surprise you to hear that?

11   A.   Absolutely.  You know -- like I said, I believed him

12   wholeheartedly.  And I had always cared a lot about him because

13   he was always very respectful, you know, really nice to me.  And

14   some of Tony's other friends -- my son's other friends were not

15   that way, and he was always just really, really nice to me.

16   When he told me that, you know, he had changed, I believed him.

17   Q.   Right.

18       Were you present when the officers involved in the search

19   approached Mr. Keener that day?

20   A.   No.  He was upstairs and I was downstairs.

21   Q.   Okay.

22   A.   So I -- you know, I had no idea what was going on upstairs.

23   I mean, you know, I had a good idea, but. . .

24   Q.   Did you go upstairs at all?

25   A.   No.

1   Q.   Okay.  I want to talk a little bit more about this bedroom.

2        Not to confuse you, but you stated that Mr. Keener lived in

3   the spare bedroom, correct?

4   A.   Yes.

5   Q.   Did that bedroom have a bed?

6   A.   Yes.

7   Q.   And did it have a nightstand?

8   A.   Yes.

9   Q.   And did you go in there often?

10  A.   Not very often.  Occasionally, but not often.

11  Q.   And you stated that this was an eastern-facing bedroom; is

12  that correct?

13  A.   Well, I don't think my house faces directly, you know.  But

14  more or less, yes, the eastern-facing bedroom.

15  Q.   And you said it was north.  Are you sure that it was north

16  and not a south-facing bedroom?

17  A.   Yes.  I mean, like I said, my street -- on a map, it's kind

18  angled toward the southwest and it was on the northeast bedroom.

19  Q.   Okay.

20  A.   I'm not real good with directions.

21  Q.   That's okay.  I don't mean to confuse you, ma'am.

22       To your knowledge, was Mr. Keener living alone in his

23  bedroom?

24  A.   No.

25  Q.   Who else was living there?

1    A.    His girlfriend at the time.  Her name was Shelby, but I

2    don't know her last name.

3    Q.    Okay.  And the morning that this all took place, was your

4    son also home?

5    A.    Yes, he was.

6    Q.    Okay.  Do you know where his bedroom -- does he have a

7    bedroom in your house?

8    A.    Yes.

9    Q.    Was it separate from Mr. Keener's?

10   A.    Yes.

11   Q.    And was anyone else present that day?

12   A.    There was a girl with my son.

13   Q.    Okay.  And in the -- after this all took place, did you

14   learn that there were controlled substances located in one

15   bedroom and there was also some contraband located in another

16   bedroom?

17   A.    Yes.

18   Q.    Would that be a set of spoons and needles?

19   A.    Yes.  That's what they told me it was.  I did not see it.

20   Q.    Okay.  And did that surprise you?

21   A.    No.

22   Q.    Can you tell us why?

23   A.    Because my son is a drug addict.

24   Q.    That must be very difficult for you.

25   A.    Yes, it is, extremely so.

1   Q.   Is he still living in your home today?

2   A.   No.

3   Q.   After that day, have you seen Mr. Keener since?

4   A.   Yes, I have.

5   Q.   Was he living in your house still?

6   A.   No.

7   Q.   And after this day, did this whole incident -- it must have

8   been really surprising that morning, wasn't it?

9   A.   Oh, extremely so, and very upsetting, too.

10  Q.   Is there anything else you want to share with the Court?

11  A.   No.  Just, I mean, you know, that's just what happened.  It

12  was, like I said, extremely upsetting.  To this day, I still

13  have PTSD symptoms from the -- from the loud noises.  And abrupt

14  things, you know, really get to me.  But...

15  Q.   Was your house damaged in the search?

16  A.   Yes.  My -- I had a double front doors and they broke

17  through the front doors and the back door, and I had to replace

18  all of them, at my expense I might add.

19  Q.   How much did that cost you?

20  A.   Well, I really don't know.  I say it was my expense, but

21  men from my community group from church got together and raised

22  the money and installed the doors for me, so I don't know.  But

23  when I looked into it, the front doors alone, since they were

24  double doors, they were going to be over $1,000.

25  Q.   I'm glad to hear you had some help.

1    MS. O'LEARY:  I'll pass the witness, your Honor.

2    THE COURT:  Ms. Driggers.

3                  CROSS-EXAMINATION

4    BY MS. DRIGGERS:

5    Q.   Ms. Jordan, you mentioned that your son -- you called him

6    Tony, but his real name is Robert, right?

7    A.   Robert Anthony, yes.  And we call him Tony.

8    Q.   And you mentioned that he's a drug addict?

9    A.   Yes.

10   Q.   And how do you know that?

11   A.   Because he admits it and, you know, he had been through

12   drug rehab which didn't do any good.  But, you know, yes, I know

13   that.

14   Q.   Well, and at the time that this incident happened, he was

15   on probation, wasn't he?

16   A.   Yes.

17   Q.   And he was ordered to attend drug treatment and drug

18   testing, things like that, right?

19   A.   Well, they said -- they highly recommended that he get drug

20   treatment, but they did not specify whether it should be

21   inpatient or outpatient or whatever.  But he voluntarily went to

22   inpatient for 30 days.

23   Q.   And your son -- I may have missed it -- was he home when

24   this incident occurred?

25   A.   Yes, he was.

1  Q.   And he's not living with you now, right?

2  A.   No, he's not.

3  Q.   And you had submitted an application for an order of

4  protection against him, right?

5  A.   Yes, I did.

6  Q.   That was in the same year, in 2017?

7  A.   Yes.

8  Q.   Did that have anything to do with his drug use?

9  A.   Yes.  That, and just my son has a lot of emotional

10  problems.  He's bipolar, and he would get very -- he would never

11  get physically violent with me.  He has a tremendous aversion to

12  men hitting women.  But the mental and emotional abuse just got

13  to where I couldn't take it anymore.  And I explained all of

14  that to the judge I saw, and he did grant me the order of

15  protection.

16          MS. DRIGGERS:  All right.  Thank you, your Honor.

17  I'll pass the witness.

18                    REDIRECT EXAMINATION

19  BY MS. O'LEARY:

20  Q.   Ms. Jordan, I just want to ask you a couple questions about

21  this bedroom.  Let me be clear where you would describe

22  Mr. Keener was staying.

23          You mentioned you had a tri-level home?

24  A.   Yes.

25  Q.   And were the bedrooms on the very top level?

1   A.    Yes.

2   Q.    Can you describe, when you come up the stairs, which way

3   would you turn in order to go to the bedroom that Mr. Keener was

4   staying in?

5   A.    Well, you come through the front door and turn right to go

6   up the stairs, and his bedroom -- there's a hall and there's a

7   bedroom on the right and then another bedroom past that, and my

8   bedroom was on the left.  His bedroom was the end one on the

9   right.

10  Q.    Okay.  So his bedroom was the last bedroom on the right?

11  A.    Yes.

12  Q.    You mentioned there was a bedroom before that one?

13  A.    Yes.

14  Q.    In the hallway?

15  A.    Yes.

16  Q.    On the right?

17  A.    Yes.

18  Q.    Whose bedroom was that?

19  A.    My son's.

20  Q.    And then yours was the bedroom on the left?

21  A.    Yes.

22  Q.    Okay.  So it went your son's, your bedroom to the left, and

23  then Mr. Keener's bedroom to the right again in the corner?

24  A.    Yes, directly across from me.

25  Q.    Thank you.

1          MS. O'LEARY:  No further questions, your Honor.

2          THE COURT:  Was his bedroom on the front of the house

3  or the back of the house?

4          THE WITNESS:  The front.

5          MS. O'LEARY:  No further questions, your Honor.

6          MS. DRIGGERS:  No, your Honor.

7          THE COURT:  All right.  Thank you, Ms. Jordan.  May

8  she be excused?

9          MS. DRIGGERS:  Yes, your Honor.

10          THE COURT:  You're free to stay in the courtroom.

11  You're also to free to leave if you would like.

12          THE WITNESS:  Thank you very much.

13      (Witness excused.)

14          MS. O'LEARY:  Your Honor, may I put Detective

15  Littleton up just for a second so we can match up some testimony

16  regarding the bedroom?

17          THE COURT:  Yes.

18  DETECTIVE RUSS LITTLETON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

19                    FURTHER REDIRECT EXAMINATION

20  BY MS. O'LEARY:

21  Q.   Detective --

22          THE COURT:  You're still under oath.

23          THE WITNESS:  Yes, ma'am.

24          MS. O'LEARY:  Thank you, your Honor.

25

1    BY MS. O'LEARY:

2    Q.   We were talking about the bedroom at issue in this case and

3    we were using directions.  I also would like to talk about the

4    bedroom described as far as right and left and front and back.

5         Mr. Keener's bedroom, the one that you believe to be his,

6    was that at the front of the house or the back of the house?

7    A.   The front of the house.

8    Q.   If you're facing the house, was it to the right or to the

9    left?

10   A.   It was to the right.

11   Q.   If you're going up the stairs to the bedroom that was

12   Mr. Keener's and you walked down the hallway, was his bedroom --

13   could you describe where it would be?

14   A.   Yeah.  You walk down the hallway.  There's a bedroom on the

15   right.  His was the second -- the last bedroom on the right.

16   You had a bathroom on the left and then Ms. Jordan's bedroom on

17   the left.

18   Q.   Okay.  And all the items in Government's Exhibits 1 through

19   4 that you testified to, were those found in Mr. Keener's

20   bedroom which is the corner bedroom?

21   A.   Yes.

22   Q.   The bedroom prior to his that was also on the right, there

23   was a set of spoons and some residue located in that bedroom,

24   right?

25   A.   Yes.

1   Q.   Did you, in the course of your investigation, make a

2   determination as to whose bedroom that was?

3   A.   That was Ms. Jordan's son.

4           MS. O'LEARY:  I'll pass the witness, your Honor.

5           THE COURT:  All right.

6                   FURTHER RECROSS-EXAMINATION

7   BY MS. DRIGGERS:

8   Q.   Detective Littleton, while we're on the subject of

9   Ms. Jordan's son, I take it you investigated his background as

10  well, right?

11  A.   Yes.  We ran him once he was placed in custody.

12  Q.   So he was arrested as well?

13  A.   He got misdemeanor charges for paraphernalia.  And I think

14  he had warrants.  I'd have to look at my notes; I didn't bring

15  them up here.

16  Q.   But you're aware he does have a criminal history, right?

17  A.   Yes.

18  Q.   And a history of drug use?

19  A.   I don't know about the drug use, but I know he had a

20  criminal history.

21  Q.   His room was how far away from the room where people say

22  Mr. Keener was living?

23  A.   I mean, when you go down the hall, it was the son's room

24  and then Mr. Keener's room was the next one, same side of the

25  house.

1  Q.   And the nightstand where these drugs were found, was there

2  a lock or anything on it?

3  A.   No.

4  Q.   And there were two other girls in the house as well, right?

5  A.   Yes, besides Ms. Jordan.

6           MS. DRIGGERS:  Thank you.

7           MS. O'LEARY:  Your Honor, we have no further questions

8  for Detective Littleton, and I have no further witnesses.

9           THE COURT:  You may stand down.  Thank you.

10      (Witness excused.)

11           THE COURT:  All right.  The Government has rested.

12  Does the defendant have any witnesses?

13           MS. DRIGGERS:  No, your Honor.

14           THE COURT:  Do you all want to argue whether he was in

15  possession of these drugs?

16           MS. O'LEARY:  I would like to, your Honor.

17           THE COURT:  All right.

18           MS. O'LEARY:  Your Honor, although Mr. Keener

19  stipulated to the technical violations that have been documented

20  in the superseding petition, the one that was at issue here

21  today, of course, was the topic of conversation with

22  Detective Littleton as well as Ms. Jordan, and that would be the

23  search warrant that took place on January 19 of 2017.

24      From the testimony and evidence, the Court heard that there

25  was a controlled purchase out of the home from Mr. Keener to the

1    CI of methamphetamine, and that was on January 18 of 2017.  The

2    CI also described the location of Mr. Keener's bedroom and that

3    substance field tested positive for methamphetamine.

4         I'd like to note that this controlled buy took place just a

5    couple months after Mr. Keener was released to supervision.  His

6    supervision started on November 18 of 2016 and I think this was

7    exactly two months later.  So just two months later we're having

8    Mr. Keener sell drugs out of a home that he's living in only

9    because of the good nature and warm heart of Ms. Jordan.

10        We heard her testimony that she wanted to help him out and

11   that she believed that he was on the straight and narrow.

12   Seeing her own son struggle, I imagine she wanted to give a safe

13   home to anyone who she thought was on the path to recovery.

14        The testimony from Ms. Jordan and her description of where

15   Mr. Keener's bedroom was, matched up with Detective Littleton's

16   testimony as to the orientation of the home as well.  This

17   bedroom that was Mr. Keener's, again, was the sole focus of this

18   search warrant after the controlled buy that took place.  We

19   heard testimony of all of the multiple controlled substances

20   that were located in that bedroom, including heroin, marijuana,

21   methamphetamine.  The testimony was that all of these amounts

22   were distributable amounts and there were also, conveniently,

23   three digital scales located in that bedroom as well.  So we

24   have three substances and three sets of scales.

25        This case, which is still pending in the State court, had

1  been bumped many times.  In that time frame, as this case has

2  been continued several times, Mr. Keener has had multiple

3  violations of various types.  If we just look at the violations

4  that took place in this year, 2018, he's submitted multiple

5  urine specimens that have tested positive for marijuana which

6  was located in the bedroom on that date and time.

7      We also have that he's failed to submit his -- well, he's

8  failed to submit a test as recently as February 15 of 2018.

9  He's really not engaged in these outpatient treatments that have

10 been available to him.  He's failed to participate in that

11 residential substance abuse treatment at Recovery Centers of

12 Arkansas.

13     Your Honor, it seems to me that because --

14          THE COURT:  I'll tell you what, it's all right for you

15 to argue the marijuana because right now what we're listening to

16 is whether he, in fact, was in possession with intent to

17 distribute.

18          MS. O'LEARY:  Okay.  Yes, your Honor.

19          THE COURT:  After I make my findings, I will give you

20 an opportunity to argue the appropriate sanctions.

21          MS. O'LEARY:  I see.  I'm sorry.

22          THE COURT:  I'd like to give him his right of

23 allocution before I let you address -- I mean, do you understand

24 what I'm saying?

25          MS. O'LEARY:  Yes, I do, your Honor.

1    THE COURT:  I prefer to do it in that way.  I don't

2  mean to be overly technical because this is a fairly informal

3  proceeding.

4    Let's just talk about whether you've established by a

5  preponderance of evidence that he was in possession of the

6  substances.  I really don't think it matters whether these were

7  distributable quantities because it's illegal for him to be in

8  possession of them in any event.

9    MS. O'LEARY:  Thank you, your Honor.  My apologies for

10  blending the argument.

11    THE COURT:  That's okay.  I just prefer to do it --

12  but I agree that the fact that he was found in possession of

13  marijuana, if the Court believes the testimony, that would be

14  evidence to show that it was he who possessed rather than

15  someone else living in the house.  If you understand that.

16    MS. O'LEARY:  I do, your Honor.  Thank you for the

17  clarification.  I appreciate it.

18    THE COURT:  That's really what we're about right this

19  minute.

20    MS. O'LEARY:  Okay.  Your Honor, I guess I was

21  addressing the intent to deliver because those are the charges

22  he's facing in State court.  However, for the purposes of

23  federal supervised release, Mr. Keener under no circumstances

24  would be able to be in compliance with the law as well as be in

25  possession --

1        THE COURT:  Come to think of it, you have to have the

2   intent to deliver for it to be a grade A violation.  Otherwise,

3   it would be a B.  But I think I'm right.

4        Am I not correct about that?

5            MS. DRIGGERS:  That's correct.

6            MS. O'LEARY:  Your Honor, based on the testimony of

7   Detective Littleton who was present when Mr. Keener was located

8   in that bedroom and all of these items that were located, which

9   the Court -- I mean, they were controlled substances, the

10  digital scales supports that he possessed them with intent to

11  distribute.  We also had a successful controlled purchase by a

12  reliable CI the day before which would support that he was, in

13  fact, distributing out of the home.

14       And we have testimony from Mr. Jordan, the owner of the

15  home as to which bedroom was Mr. Keener's.  The fact that there

16  was somebody else in the house that may have been using

17  controlled substances as well doesn't go to support

18  Mr. Keener's innocence.  In fact, I think it supports the fact

19  that he was, in fact, delivering these items.

20       And the items of contraband that were located in the

21  bedroom of Ms. Jordan's son were kind of like still in the realm

22  of the controlled substances that were located in Mr. Keener's

23  bedroom.  They all kind of go together in my opinion, and I

24  think that the items were in his nightstand and next to his bed

25  and under his bed where he was the date that the search warrant

1    was executed, which was just one day after he completed a

2    controlled purchase in that bedroom.

3         So for all of those reasons, I think that the burden that

4    the Government needs to meet has been met to show that

5    Mr. Keener possessed with intent to distribute heroin,

6    marijuana, and methamphetamine while he's been on federal

7    supervised release.

8              THE COURT:  All right.  Ms. Driggers?

9              MS. DRIGGERS:  Thank you, your Honor.

10        I realize the burden of proof in this hearing is a little

11   bit different than in a jury trial.  But notwithstanding that,

12   the Government still has two hurdles to overcome.  They have to,

13   number one, prove that Mr. Keener was in possession of a

14   controlled substance for it to be a Grade B violation.  And then

15   they also have to prove that he was distributing a controlled

16   substance to be a Grade A.  So there are a couple of findings

17   that the Court needs to make.

18        With respect to both, however, I would submit that the

19   evidence falls short of meeting the preponderance standard.  The

20   warrant that initially started this investigation was based on

21   information from one informant that had not been corroborated

22   and there was no recording.  In other words, typically we'll see

23   the informant equipped with an audio or video recording device

24   and we can see the hand-to-hand, but --

25             THE COURT:  Not always.

1          MS. DRIGGERS:  Not always, that's true.

2          THE COURT:  I don't even know that that's typical in

3    the cases that I have had.  They watch the informant go in and

4    out and they pat him down to make sure.  I don't know if there

5    was any testimony about that.

6          MS. DRIGGERS:  There was no testimony.  In a lot of

7    the cases that I have, we do have those.  So that was just the

8    point I was making is that we're relying solely on the informant

9    and their credibility which we know was motivated, in part, by

10   financial compensation.

11       Secondly, when the arrest was eventually made and the

12   warrant was executed, there were controlled substances found in

13   the bedroom where Mr. Keener was sleeping with someone else, but

14   we didn't hear any testimony linking that evidence to

15   Mr. Keener.  In other words, sometimes we'll see mail or a

16   driver's license or some identifying information that's also in

17   the same location where the drugs were found.  But we didn't

18   hear any of that today.

19       We also heard that there were other drug users, and the son

20   who has a pretty heavy history of drug use also living in the

21   home.  The controlled substances were not locked up in, you

22   know, some place that only Mr. Keener had access to.  They were

23   not on his person.  There was no fingerprints.  In fact, there

24   was no real witness statements.  We didn't hear about what the

25   other people in the house had to say about it.  Mr. Keener was

1    simply arrested because he was in that bedroom.  But there were

2    other people in that house who had access to those drugs and who

3    have a history of using those drugs.  We would submit that

4    without additional information tying Mr. Keener to the

5    controlled substances, the Court must deny this violation.

6         Thank you.

7              THE COURT:  All right.  Is there any reason I

8    shouldn't make my findings at this time with respect to this

9    alleged violation?

10             MS. O'LEARY:  No, your Honor.

11             MS. DRIGGERS:  No, your Honor.

12             THE COURT:  All right.  The Court has listened to the

13   testimony and has listened to the arguments, and the Court finds

14   that the United States has established by a preponderance of

15   evidence that Mr. Keener committed a Grade A violation in that

16   he was in possession of illegal substances, as charged in the

17   petition to revoke, and that he was in possession of these

18   substances with intent to distribute at least some of them.

19        And the reason I say at least some of them, I don't

20   understand very much about the quantity of heroin that was

21   really there.  We know that two quantities, two individual bags

22   were found with heroin in them and that one was tested positive

23   for heroin.  The other was not tested.  I mean, so I can't say

24   what that other one was.  I really don't know.

25        I also know that just from his history, that this defendant

1    really likes to use marijuana himself.  And it's conceivable

2    that all of this marijuana was stuff he intended to use on his

3    own.

4         That evidence is outweighed, however, by the fact that the

5    confidential informant actually purchased -- I find it credible

6    that the informant actually purchased drugs from Mr. Keener.  I

7    also find it very likely that he was distributing them because

8    he had scales.  In other words, he wanted to measure them and he

9    probably didn't want to measure them right before he ingested

10   them.  He probably wanted to measure them because he was selling

11   them to somebody.

12        As to the fact that there were other people, maybe even

13   drug users in the house, the Court finds that it was more likely

14   than not Mr. Keener, who was in possession of them because the

15   testimony is that that was his bedroom, that the drugs were

16   found in the nightstand and under the bed.  I do know that he is

17   a former drug user.  He was also -- the underlying conviction is

18   for drugs.  And in fact -- was it opioids, the earlier

19   conviction, is that correct, the underlying conviction?

20             THE DEFENDANT:  (Nodding head.)

21             THE COURT:  That's what I thought.  Of course, heroin

22   is related to the opioids.

23        I find that the Government has established by a

24   preponderance of the evidence that this was a Grade A violation.

25   I realize when I make this finding that Ms. Driggers was

1    constrained.  As she had explained to the Court right before we

2    started hearing the evidence, she doesn't want to interfere with

3    his retained counsel in the defense of this crime in another

4    jurisdiction.

5        She also -- the last time we were here which was the latter

6    part of 2017 -- felt that it was a gamble as to whether to

7    have -- for me to have him found responsible for Grade C

8    violations or to go forward.  So I'm not criticizing her

9    representation of him.  I think she is exercising her discretion

10   and her legal judgment in representing him in this way today,

11   and I think that she has shown prudence in doing this.

12       Like so many things, nothing is certain in this life.  She

13   could not control the fact that the United States chose today to

14   put on this evidence, and so I do find that this is a Grade A

15   violation and I need to make some findings before we proceed.

16       The Grade A violation for a criminal history category V

17   has guideline provisions, and the guidelines are, of course,

18   superceded by the statutory provisions.  The custody range under

19   the statute for a Class C felony for a supervised release

20   violation is no more than two years' incarceration.  So that is

21   the extent to which I'm restrained.  I cannot sentence him today

22   to more than two years.

23       The Court must revoke for a Grade A violation under the

24   policy statements of the guidelines and under the statutes.  The

25   Court could sentence him also to a period of supervised release

1    of no fewer than three years following this incarceration.  The

2    original offense authorizes supervised release of up to life.

3        Of course, I don't know for sure, but it looks to me as if

4    Mr. Keener just kind of gave up.  In other words, you just

5    didn't do much of anything lately in terms of abiding by the

6    conditions of your supervised release.  I don't know whether you

7    gave up.  You can tell me about it, what happened.  But the

8    Court had been lenient with you certainly.  Again, if this

9    remained a Grade C violation, I could do some other things as

10   sanctions, but it's a Grade A and I must revoke.

11       So now I will ask Mr. Keener -- first of all, let me ask

12   Ms. Driggers.  Do you have any evidence you want to present in

13   mitigation?  I'm talking about evidence.

14            MS. DRIGGERS:  No, your Honor.  But may I approach for

15   just a minute.  May we approach.

16       (Bench conference reported as follows:)

17            MS. DRIGGERS:  I hate to put this on the record, but

18   Mr. Keener has wet himself.  He's had an accident.  Would it be

19   okay if he remained at a counsel table?

20            THE COURT:  Of course.

21       (Proceedings continuing in open court as follows:)

22            MS. DRIGGERS:  We don't have any evidence in

23   mitigation to present, your Honor.

24            THE COURT:  I need to give Mr. Keener his right of

25   allocution.  He has the right to address the Court before the

1    Court imposes sentence.

2             THE DEFENDANT:  No, thank you.

3             THE COURT:  Ms. Driggers?

4             MS. DRIGGERS:  I would just add that I recognize that

5    the guidelines actually produce a higher sentencing ranges.  So

6    we don't have any objection to the Court imposing a 24-month

7    sentence.  But we would ask that if he does serve that two

8    years, that will carry over into past the time he would have

9    already been terminated for supervised release.  We're asking

10   the Court not to impose any supervised release to follow.

11            THE COURT:  What does the United States have to say?

12            MS. O'LEARY:  Your Honor, we do request the guideline

13   range of 24 months of custody.

14        As far as supervised release goes, my understanding is

15   that -- you know, your Honor, I don't know whether this -- the

16   not less than three years, which would be under the statute and

17   guidelines for supervised release, would be able to be reduced

18   because it's a revocation.  I'll leave that to the Court's

19   discretion.

20            THE COURT:  I don't think it -- he's already on

21   supervised release.  I do not believe that I am required to

22   impose supervised release in a situation like this where the

23   sentence is on a revocation.

24            MS. O'LEARY:  Okay.

25            THE COURT:  At least that's the way I've always done

1    it.

2         MS. DRIGGERS:  That's the way I understand it.  The

3    revocation statute directs you to the underlying statute which

4    is the no less than.  But because he's already on supervised

5    release, the Court doesn't have to reimpose that.

6         THE COURT:  Is there any reason I shouldn't impose

7    sentence at this time?

8       I will do what the lawyers have anticipated.  Mr. Keener, I

9    revoke your supervised release and sentence you to a term of 24

10   months' incarceration with no supervised release to follow.  I

11   do recommend that you participate in nonresidential substance

12   abuse treatment during your incarceration.

13      I find that this is a fair sentence under the

14   circumstances.  I am considering the factors listed in 18 United

15   States Code Section 3553(a).  I will ask in the -- if you want

16   me to, I will request that the Bureau of Prisons assign you to a

17   particular institution if you would like.

18        MS. DRIGGERS:  Yes, your Honor.  Would the Court

19   recommend Yazoo City?

20        THE COURT:  All right.  I will request Yazoo City.  Is

21   that so he can be close to family?

22        MS. DRIGGERS:  It is, your Honor.  He has a relative

23   that works at Forrest City, so he wasn't previously allowed to

24   report there.  And Yazoo City is the next closest one.

25        THE COURT:  All right.  I will do that.

1          Mr. Keener, it is my duty to tell you that you have a right

2     to appeal this order if you believe this is an abuse of judicial

3     discretion or contrary to law.  You must file your notice of

4     appeal within 14 days of my entering the order.  You have the

5     right to an attorney and to have notice of appeal filed for you.

6          You are not going to have to pay for the cost of an appeal

7     because you have representing you Ms. Driggers.  It baffles me

8     that you have retained counsel in court, which makes me wonder

9     whether you deserve public defender representation, but I will

10    not pursue it.  It hasn't been our custom in court to pursue it,

11    but sometimes I think I should and just find out just how much

12    people really need the public defender, because we all pay for

13    the public defender.  People who are able to hire their own

14    lawyer such as you -- you're able to hire yours -- don't deserve

15    public defender representation.  But I will not worry about it

16    unless the Government wants to take it up.

17          MS. O'LEARY:  No.

18          THE COURT:  I find that you've already benefitted, to

19    the extent you can, from supervised release and I don't think

20    you've benefitted very much.  So that's my reason for no

21    supervised release.

22          THE DEFENDANT:  Thank you.

23          THE COURT:  Is there anything more?

24          MS. DRIGGERS:  Yes, your Honor.  Mr. Keener reported

25    here on time and drug-free today, and because he does have a

1   jury trial coming up on April 10th, would the Court giving him a

2   30-day period of time to self-report?

3          THE COURT:  What do you have to say about that?  He

4   had been doing well for a while.

5      Do you still have a job.

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Where are you working?

8          THE DEFENDANT:  I'm working with my stepfather at

9   Nutrition Daycare Center.

10         THE COURT:  Nutrition Daycare Center.

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Your Honor, I would object to Mr. Keener

13  being allowed to remain out pending his jury trial.  Although I

14  understand this could create somewhat of a hurdle for his

15  representation in State court to communicate with Mr. Keener,

16  it's not the most convenient situation, the reason the United

17  States went forward today on the State charges is because

18  Mr. Keener had a series of restrictions he was under on

19  supervised release and he's failed to meet those consistently

20  and over a period of time.  I'm not comfortable with Mr. Keener

21  being allowed to remain out because his history did not support

22  one that would give me any confidence that he would remain under

23  those restrictions and abide by them pending his jury trial.

24         THE COURT:  Well, he had done well and then he really

25  fell off the wagon pretty hard, particularly in 2018.  They are

1    technical violations, but they were numerous.  And this was a

2    drug offense and so the Court finds by a preponderance of

3    evidence that the Government has established -- it's really

4    not -- I don't know that this is on the Government, but

5    Mr. Keener is not likely to abide by the conditions of his

6    release.  So the Court will direct that he be detained beginning

7    now.

8        And I believe that it would be prudent -- we're going to go

9    off the record -- prudent if he just remain seated there so you

10   can talk to the CSO's about something you had mentioned to the

11   Court.

12            MS. DRIGGERS:  Yes, your Honor.

13            THE COURT:  With that, Court is in recess right now.

14   Mr. Keener, you're just to remain right there.

15            THE DEFENDANT:  Yes, ma'am.

16            THE COURT:  Thank you.  Thank you.

17        (Proceedings concluded at 11:25 a.m.)

18                        CERTIFICATE

19       I, Margaret M. Kruse, Official Court Reporter, do hereby

20   certify that the foregoing is a true and correct transcript of

21   proceedings in the above-entitled case.

22

23   /s/ Margaret M. Kruse, CSR, RMR, CRR
                                Date:  March 19, 2018
24   United States Court Reporter

25